IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Charles A.,[1] | ) | C/A No.: 1:20-cv-2794-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Donald C. Coggins, Jr., United States District Judge, dated August 7, 2020, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.      Relevant Background

    A.      Procedural History

On November 30, 2016, Plaintiff filed an application for DIB in which he alleged his disability began on July 25, 2016. Tr. at 76, 157–60. His application was denied initially and upon reconsideration. Tr. at 96–100, 102–08. On November 8, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ronald Fleming. Tr. at 34–63 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 18, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–30. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 30, 2020. [ECF No. 1].

    B.      Plaintiff's Background and Medical History

        1.      Background

Plaintiff was 37 years old at the time of the hearing. Tr. at 40. He completed high school. Tr. at 42. His past relevant work ("PRW") was as a

field superintendent and a contractor. Tr. at 43–44. He alleges he has been unable to work since July 25, 2016. Tr. at 157.

      2.    Medical History

Plaintiff presented to Morgan Armstrong, PA-C ("PA Armstrong"), on July 27, 2016. Tr. at 340. Plaintiff's mother was concerned, as he had reported seeing people in the woods behind his house, hearing voices in his vents, having a neighbor watching his Wi-Fi, having his phone hacked, and having loans taken out in his name without his knowledge. *Id.* Plaintiff reported he had stopped taking Lexapro several months prior and denied current paranoia, although he admitted to having been paranoid in the past. *Id.* Plaintiff reported to PA Armstrong that his neighbors had been hacking his computer and Wi-Fi over the prior three years, his accounts and devices and those of others around him and businesses he visited had been hacked, and he received emails threatening his children. *Id.* He admitted that his employer had threatened to fire him because he had left work to check on his children after receiving a threatening message and had been missing work because he felt that his work phone and tablet had been hacked. *Id.* He indicated he had lost 30 pounds over the prior two months because he was obsessed with these issues and failed to eat. *Id.* PA Armstrong assessed anxiety disorder, depression, delusions, and acute paranoia and referred Plaintiff for mental health treatment. Tr. at 341–42.

A plan of care from Lexington County Mental Health ("LCMH") indicates Plaintiff was admitted for treatment of bipolar I disorder and amphetamine-type substance abuse disorder on July 29, 2016. Tr. at 319. His problems included variable mood, anxiety, substance use, and family relationship concerns. *Id.*

Plaintiff was transported by police to Lexington Medical Center ("LMC") on August 24, 2016, after commenting that he would "blow off [his] head before [he would] go to any more mental hospitals." Tr. at 285. He endorsed being under a lot of stress due to financial problems and stated his computer had been hacked and his identity stolen. *Id.* He claimed that he had made the comment to his parents because he was stressed and upset with them and wanted them to leave him alone. *Id.* He denied having guns in his possession and said he would not kill himself because of his children. *Id.* Douglas M. Weddle, M.D. ("Dr. Weddle"), observed Plaintiff to have normal mood, affect, behavior, and thought content. Tr. at 287. He diagnosed agitation and situational stress and advised Plaintiff to follow up with Gregory J. Konduros, M.D. ("Dr. Konduros"), within a day. Tr. at 288.

On October 26, 2016, social worker Elizabeth Polinsky ("SW Polinsky"), noted Plaintiff had received four assessment services, four physician medical order ("PMO") services, and one crisis intervention and had cancelled two appointments at LCMH over the period from July 29 to October 27. Tr. at

4

320. She stated Plaintiff had failed to engage in the therapy process, had not met his plan of care ("POC") goals, continued to meet diagnostic criteria, and had severe symptoms. *Id.*

Plaintiff followed up for anxiety on November 3, 2016. Tr. at 337. He reported doing well, but indicated he did not feel that LCMH was doing much to help him and had stopped his medications other than those Dr. Konduros had prescribed. *Id.* He denied auditory and visual hallucinations and delusions. *Id.* Dr. Konduros recorded normal findings on exam. Tr. at 338. He assessed anxiety disorder, history of delusions, and history of depression. *Id.* He referred Plaintiff to a psychiatrist and prescribed Klonopin. Tr. at 339, 341.

On December 28, 2016, Plaintiff was transported by emergency medical services ("EMS") to the emergency room ("ER") at Baptist Parkridge Hospital after experiencing hallucinations and presenting to the door with a sword when police arrived. Tr. at 290. James P. Hassinger, M.D. ("Dr. Hassinger"), noted Plaintiff was very anxious and fidgety and had a hard time sitting still on the bed. *Id.* Plaintiff denied auditory and visual hallucinations and suicidal and homicidal ideation, but reported that someone had shown up at his house and held a gun to his and his kids' heads. Tr. at 290–91. Dr. Hassinger noted that reports from police and Plaintiff's parents suggested this did not happen. Tr. at 291. He wrote:

5

> The patient is the primary caretaker of his children. I am very concerned about his ability to be a safe father with his psychosis combined with amphetamine abuse. This could result in serious injury or even death to his children. I strongly recommend that his children be removed from his custody.

*Id.* He ordered a urine drug screen ("UDS") and suspected Plaintiff had a combination of substance-induced psychosis and organic psychosis. *Id.* He considered Plaintiff a threat to himself and others, consulted with a counselor, and the two agreed to commit him. *Id.* Plaintiff's UDS was positive for amphetamines. Tr. at 294.

Plaintiff was hospitalized at Three Rivers Behavioral Health from December 28, 2016, to January 5, 2017. Tr. at 296. He admitted to having been under the influence of methamphetamine when he threatened police with a sword. *Id.* He stated he used methamphetamine once a month. *Id.* Mary Boyd, M.D. ("Dr. Boyd"), noted Plaintiff was no longer exhibiting signs of psychosis at the time of admission. *Id.* She restarted Plaintiff on Depakote ER and discontinued Ativan. Tr. at 297. Plaintiff attended daily individual treatment and group therapy sessions. *Id.* Dr. Boyd discharged Plaintiff to follow up for court-ordered treatment at LCMH and the Lexington/Richland Alcohol and Drug Abuse Council ("LRADAC"). Tr. at 297, 302. Plaintiff's discharge diagnoses included unspecified mood disorder, severe amphetamine use/sedative hypnotic use disorder, and resolved history of substance-induced

psychosis. Tr. at 298. He had normal mental status at the time of discharge. Tr. at 300.

Counselor Janine Bryan ("Counselor Bryan") evaluated Plaintiff on January 11, 2017. Tr. at 444. Plaintiff expressed his goals included gaining custody of his children and weaning himself from Klonopin, despite his extreme anxiety. *Id.*

Plaintiff underwent a biopsychosocial assessment at LRADAC on January 13, 2017. Tr. at 356–58. He reported having used alcohol one to two days a week with his last use on January 2 and methamphetamine one to three days during the prior month with his last use on December 27. Tr. at 356. He met criteria for diagnoses of severe alcohol use disorder, severe cannabis use disorder, and mild amphetamine, methamphetamine, and cocaine use disorders. Tr. at 357. He was also assessed as having severe post-traumatic stress disorder ("PTSD"). *Id.*

Plaintiff's UDS was negative for illicit substances on January 17, 2017. Tr. at 372.

In a progress note for the period from October 27, 2016, to January 25, 2017, SW Polinsky indicated Plaintiff had received one mental health assessment service, two PMOs, three individual therapy services, one crisis service, and one nursing service. Tr. at 321. She noted Plaintiff continued to

meet diagnostic criteria, had not met his goals, and was recently ordered by the court to continue treatment for a year. *Id.*

Plaintiff's UDS was negative on January 27, 2017. Tr. at 370.

On February 10, 2017, Plaintiff endorsed anxiety, depression, irritability, and sleep disturbance. Tr. at 440. Lisa Legrand, R.N., M.S.N., recorded normal mental status findings and scheduled Plaintiff to follow up with a psychiatrist. Tr. at 441.

On March 3, 2017, Plaintiff reported doing well overall, but feeling more depressed. Tr. at 439. He noted he was attending church and LRADAC meetings and was enjoying both. *Id.* SW Polinsky encouraged Plaintiff to continue to engage in pleasant activities to improve his mood. *Id.*

Plaintiff presented to A. Nicholas DePace, Ph.D. ("Dr. DePace"), for a consultative psychological evaluation on March 8, 2017. Tr. at 323. He reported his phone and laptop had been hacked, leading to theft of his bank account information, email address, and credit cards. *Id.* However, Dr. DePace noted it was unclear whether these events truly occurred. *Id.* Plaintiff also reported a psychotic episode after having relapsed on methamphetamine in December 2016. *Id.* He endorsed numerous physical injuries to his feet, knees, shoulder, and ribs that prevented him from exerting himself as he had in the past. *Id.* He stated the Department of Social Services ("DSS") had recently removed his children from his home. *Id.* Plaintiff indicated he could

8

manage his funds, perform basic hygiene, cook, drive, and engage in most inside and outside chores if he felt physically able. Tr. at 324. He stated he visited his children in his parents' home daily and had provided all their care for the ten years prior to their removal. *Id.* He said he rarely interacted with others since discontinuing use of methamphetamine. *Id.*

Plaintiff reported having participated in counseling on numerous occasions. *Id.* He indicated he had twice been psychiatrically hospitalized. *Id.* He noted he was taking Klonopin and Depakote. *Id.* He admitted he had used methamphetamine, cocaine, and prescription medications on a regular basis over a 10-year period that ended in his mid-twenties. *Id.* He said he was a "bad alcoholic" for about 10 years until his mid-thirties. *Id.* He indicated he had become "clean" about two years prior, but had relapsed "a few times" since then. *Id.*

Dr. DePace noted Plaintiff presented normally on mental status exam ("MSE"). Tr. at 324–25. He administered the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV"), and Plaintiff obtained a full-scale score of 106, which was considered average. Tr. at 325. Plaintiff scored in the forty-seventh percentile on the Wide Range Achievement Test: Fourth Edition ("WRAT-4"), consistent with a grade equivalent of 12.7. *Id.*

Dr. DePace's diagnostic impressions were methamphetamine use disorder, alcohol use disorder, history of cocaine use disorder, and history of

prescription medication misuse disorder. *Id.* He indicated he would very strongly consider a diagnosis of substance-induced psychotic disorder, given Plaintiff's December 2016 presentation. *Id.* He wrote: "While he has reportedly been diagnosed with bipolar disorder in the past, I do not feel that this diagnosis can be reliably offered given the significant use of substances over the years and their relationship with the reported episodes reported by his treatment providers." Tr. at 326. He stated Plaintiff's presentation was "not suggestive of any type of psychotic symptoms at this time, even of a residual nature." *Id.* He further wrote:

> At this time, he appears to have the ability to appropriately and effectively interact with others with no significant difficulties; based upon his presentation and his report, it appears that this would likely continue to be the case as long as he refrains from any drug use. Cognitively, he appears to be functioning in the Average to High Average range; he does not appear to have had any changes in his cognitive abilities since he was last employed. While he certainly has the ability to manage his own funds, the relative recency of his drug use raises significant concerns about his ability to manage any significant amounts of funds that he would have in his possession.

*Id.*

On March 8, 10, 22, 24, 30, and 31 and April 6, 12, and 20, 2017, Plaintiff's UDSs were positive for benzodiazepines,[2] but negative for other substances. Tr. at 361–69.

---

[2] The results appear to be consistent with Plaintiff's use of prescribed Klonopin. *See* Tr. at 324, 335, 341.

On March 13, 2017, Fransetta Sterling, M.D. ("Dr. Sterling"), discontinued Cogentin and prescribed Depakote 250 mg, instructing Plaintiff to take one a day for seven days, two a day for seven days, and then three per day. Tr. at 438. She recorded normal findings on MSE and indicated Plaintiff was more alert. Tr. at 437, 438.

On March 17, 2017, Plaintiff presented to Damon Daniels, M.D. ("Dr. Daniels"), for a physical consultative exam. Tr. at 327. He reported intermittent sharp, stabbing low back pain associated with numbness in his legs due to an injury and fracture seven years prior. *Id.* He endorsed left shoulder pain due to injury in a motorcycle accident 10 to 11 years prior. *Id.* He indicated he had undergone surgery at the time. *Id.* He said he had injured his left ankle and shattered his heel, requiring surgery in 2014. *Id.* He indicated he had difficulty standing for more than a couple of hours without significant pain. *Id.* He said he could lift 30 to 40 pounds, sit for less than 30 minutes, stand for less than 60 minutes, and walk for less than 60 minutes at a time. *Id.* Dr. Daniels noted mostly normal findings on exam, aside from 1+ pitting edema in Plaintiff's left ankle, lumbar flexion to 80/90 degrees, lumbar extension and lateral flexion to 15/25 degrees, right shoulder abduction and forward elevation to 130/150 degrees, left shoulder adduction to 130/150 degrees, left shoulder forward elevation to 50/150 degrees, left ankle dorsiflexion to 10/20 degrees, left ankle plantar flexion to 20/40

degrees, 4/5 strength in the proximal and distal muscle groups of the left arm and leg, decreased sensation to light touch and pinprick from the left mid-calf area to the plantar surface of the left foot, anxious affect, and inability to perform tandem, heel, and toe walks. Tr. at 328–30. Dr. Daniels assessed chronic low back pain, chronic left shoulder pain, chronic left ankle and heel pain, anxiety, and bipolar disorder. Tr. at 330. He stated Plaintiff's most significant findings were in his left ankle, where he had significant range of motion ("ROM") issues and difficulty with his gait related to his injuries. *Id.*

On April 3, 2017, state agency medical consultant Robert Kukla, M.D. ("Dr. Kukla"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, crawl, and climb ramps or stairs. Tr. at 71–73. A second state agency medical consultant, George Walker, M.D. ("Dr. Walker"), reviewed the record and assessed the same physical RFC on December 9, 2017. *Compare* Tr. at 71–73, *with* Tr. at 89–90.

On April 17, 2017, Plaintiff attended a counseling session with SW Polinsky. Tr. at 433. He endorsed moderate depressive symptoms, had

minimal anxiety symptoms while taking Klonopin, and had a subclinical score for PTSD. *Id.*

Plaintiff's UDSs were negative for illicit substances on May 5 and 11, 2017. Tr. at 359, 360.

On June 5, 2017, state agency psychological consultant Kevin King, Ph.D. ("Dr. King"), reviewed the record and completed a psychiatric review technique ("PRT"). Tr. at 69–70. He considered Listing 12.06 for anxiety and obsessive-compulsive disorders and assessed Plaintiff as having a mild degree of impairment in the mental functional areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. Tr. at 69.

Plaintiff presented to Dr. Konduros for follow up as to anxiety and possible bipolar disorder on July 3, 2017. Tr. at 333. He reported doing well on his medication regimen. *Id.* He stated he had undergone weekly drug tests since having been released from Three Rivers and had been clean since December 29, 2016. *Id.* Dr. Konduros recorded normal findings on exam. Tr. at 335. He prescribed Klonopin twice daily as needed for anxiety and instructed Plaintiff to continue his outpatient therapy. *Id.*

In a progress summary dated August 8, 2017, SW Polinsky indicated Plaintiff had received one crisis service, participated in three interpersonal

process group therapy sessions, failed to attend three group therapy sessions and one PMO, and cancelled one individual therapy session over the period beginning April 25, 2017. Tr. at 353. She recommended continued treatment, as Plaintiff continued to have mood disturbance due to depression and anxiety and to struggle with the substance recovery process. *Id.*

In a progress summary dated September 22, 2017, SW Polinsky noted Plaintiff had attended one group therapy appointment and one mental health assessment appointment and had failed to attend one individual therapy appointment and cancelled two group therapy appointments over the period beginning July 24, 2017. Tr. at 354. She indicated Plaintiff completed four group therapy sessions, but they had concluded that participation in group therapy was not best given his commitment to the LRADAC classes. *Id.* She stated Plaintiff had limited progress toward thought evaluation, had passive suicidal ideation, and continued to struggle with substance use and interpersonal difficulties. *Id.*

Plaintiff participated in a telehealth visit with Christopher J. Jones, M.D. ("Dr. Jones"), for psychiatric medication assessment on October 5, 2017. Tr. at 351. Dr. Jones indicated Plaintiff had a longstanding diagnosis of bipolar disorder. *Id.* Plaintiff denied frank mood lability and noted depressive symptoms were his primary problem. *Id.* He denied paranoia and indicated he felt as if his prior paranoia had been substance-induced. *Id.* He stated he

14

had previously taken Depakote, Zoloft, Paxil, and Abilify and had discontinued them either because they were ineffective or they caused significant gastrointestinal symptoms. *Id.* He endorsed some improvement with a recent trial of Lithium. *Id.* Dr. Jones recorded normal findings on MSE. *Id.* He assessed bipolar I disorder with psychotic features, moderate amphetamine-type substance use disorder, and nonadherence to medical treatment. *Id.* He discontinued Depakote and prescribed Lithium Carbonate 300 mg. Tr. at 351–52. He instructed Plaintiff to titrate his dose, taking one pill the first three to five days, two pills a day for three to five days, and one pill in the morning and two in the evening thereafter. *Id.*

On October 13, 2017, counselor Richard Lackey ("Counselor Lackey") transferred Plaintiff from a program at LRADAC Richland to LRADAC Lexington. Tr. at 379. He indicated in the discharge request form that Plaintiff had not attended self-help programs within the last month, had last used methamphetamine in July 2017, and had last used amphetamine or other stimulants in September 2017. *Id.* Plaintiff denied use of alcohol and drugs within the prior 30 days, as corroborated by UDS. Tr. at 381. Counselor Lackey noted Plaintiff was "[f]ully functioning physically and able to stand pain or discomfort." *Id.* He further noted Plaintiff "continue[d] to struggle with healthy ways to manage stress and unpleasant emotion," "struggle[d] with anxiety" with improved symptoms, and had bipolar disorder

"appropriately managed through medication." *Id.* He noted Plaintiff's primary issues with alcohol and drug use "appear[ed] to be related to inadequate mental health treatment and/or unhealthy management of stress/emotions." Tr. at 382.

On October 13, 2017, SW Polinsky noted Plaintiff had attended one group therapy appointment, one PMO, and two mental health assessments; had failed to attend two group therapy appointments and one individual therapy appointment; and had cancelled one therapy appointment since July 24, 2017. Tr. at 355. Plaintiff endorsed increased mood after having started Lithium. *Id.*

On November 17, 2017, Plaintiff attended a therapy session with social worker Kendra Speckman ("SW Speckman"). Tr. at 451. SW Speckman observed Plaintiff to be appropriately dressed and clean; to demonstrate normal motor activity, speech, eye contact, thought process, and thought content; to have a euthymic mood; and to be talkative. *Id.* She noted Plaintiff appeared cooperative and motivated. *Id.*

Plaintiff complained of feeling more depressed on December 8, 2017. Tr. at 450. SW Speckman encouraged Plaintiff to connect with others instead of isolating and to increase his physical activity. *Id.*

A second state agency psychological consultant, Catherine Blusiewicz, Ph.D. ("Dr. Blusiewicz"), completed a PRT on December 14, 2017. Tr. at 86–

88. She considered Listing 12.08 for personality and impulse-control disorders, in additional to Listing 12.06, and assessed a mild degree of impairment in all four areas of mental functioning. Tr. at 86.

Plaintiff was hospitalized at LMC from January 3 to January 5, 2018. Tr. at 470–95. He presented with delusions of being attacked by others and having his identity stolen. Tr. at 471. He endorsed confusion and sleep disturbance. Tr. at 472. A UDS was positive for amphetamines, and Plaintiff admitted to "using some meth on occasions." Tr. at 474, 482. Plaintiff's discharge diagnoses were psychosis and delusional disorder. Tr. at 476. Lee J. Boguski, M.D. ("Dr. Boguski"), indicated Plaintiff developed psychosis when he used methamphetamine and had been off Lithium. Tr. at 477. Plaintiff underwent a psychiatric consultation with Charles H. Ham, M.D., who determined that he did not meet criteria for commitment, as he was no longer delusional and able to hold a conversation and provide reasonable history. Tr. at 476, 482. Plaintiff claimed he continued to experience hallucinations and delusions when he did not use methamphetamine, but admitted they were worse when he did use it. Tr. at 483. Dr. Buguski discharged Plaintiff with a prescription for Lithium and instructed him to follow up at LCMH. Tr. at 481.

Plaintiff was discharged from services at LRADAC on February 2, 2018, after being incarcerated. Tr. at 416. Counselor Lackey encouraged

Plaintiff to return to LRADAC for treatment services following his release. *Id.*

Records from the Lexington County jail reflect that on January 16, 2018, Jose DeJesus Chavez, M.D. ("Dr. Chavez"), ordered Plaintiff start Lithium 300 mg twice a day and continue Clinical Institute Withdrawal Assessment ("CIWA") detox. Tr. at 387. Counselor Detra L. Turner ("Counselor Turner") examined Plaintiff on January 22, 2018, and noted normal findings on MSE. Tr. at 394–95. She recorded Plaintiff as having normal affect and congruent mood and denying suicidal and homicidal ideation. Tr. at 395. On January 25, 2018, Plaintiff denied suicidal and homicidal ideation. Tr. at 393. He was oriented in all spheres, seemed to be adjusting well, made good eye contact, and was in minimal distress. *Id.* Social worker Coretta Kea ("SW Kea") assessed Plaintiff on February 10, 2018. Tr. at 390. She noted he had normal affect, congruent mood, appropriate speech and appearance, coherent thought form, appropriate thought content, average intelligence, intact memory, good insight and judgment, appropriate behavior, was fully oriented, and denied suicidal ideation. Tr. at 390–91. She stated Plaintiff reported having recently been diagnosed with a cyst or tumor on his brain and was concerned with wanting to sign a release of information consent form so that his mother could speak to staff regarding his care. Tr. at 390. Plaintiff endorsed increased anxiety and interrupted sleep, but indicated

he was eating well. *Id.* SW Kea had Plaintiff sign the release form. *Id.* On March 21, 2018, Plaintiff requested that his family be permitted to provide him shoes, as he had undergone surgical repair of his foot four years prior and the facility shoes offered no support and increased pain to his foot and ankle. Tr. at 384. The nurse noted a surgical scar, but no discoloration or edema. *Id.* She referred Plaintiff to a doctor for evaluation. Tr. at 385. Timothy Parsons, M.D. ("Dr. Parsons"), examined Plaintiff on May 4, 2018, and noted a normal exam. Tr. at 396–97. Plaintiff requested Flexeril and soft shoes, and Dr. Parsons prescribed a five-day supply of Flexeril and authorized soft shoes, provided they complied with policy and security concerns. Tr. at 397.

Plaintiff was admitted to Morris Village for treatment on June 5, 2018, pursuant to a condition of his sentence for burglary, after having been incarcerated for five months. Tr. at 399–400. His discharge diagnoses included severe methamphetamine use disorder, bipolar disorder, and nicotine use disorder. Tr. at 399. He was discharged on July 3, 2018. *Id.*

Plaintiff returned to LRADAC for treatment on July 9, 2018. Tr. at 414.

Plaintiff's UDS was negative for illicit substances on August 2, 2018. Tr. at 420. His UDS was positive for amphetamine on August 10, 2018. Tr. at 421. His UDSs were negative for illicit substances on August 17 and 24 and September 4, 2018. Tr. at 422–24. Plaintiff's UDS was positive for

19

amphetamine on September 7, 2018. Tr. at 425. His UDSs were negative for all illicit substances on September 24, October 1, 18, and 19, and November 1, 2018. Tr. at 426–30.

Plaintiff presented to LMC by ambulance on October 14, 2018. Tr. at 496. He was experiencing psychosis, exhibiting erratic behavior, and agitated such that he required transient restraints until he was medicated. Tr. at 497. An intake note indicates Plaintiff took methamphetamine, heroin, and lysergic acid diethylamide ("LSD") and was tased by law enforcement prior to being transported to LMC. *Id.* Plaintiff subsequently denied having taken heroin and methamphetamine. *Id.* Paul Shahbahrami, M.D. ("Dr. Shahbahrami"), observed Plaintiff to demonstrate an angry affect and aggressive, violent, and manic behavior. Tr. at 499. He was unable to assess Plaintiff's cognitive process. *Id.* However, after Plaintiff was medicated, Dr. Shahbahrami noted appropriate affect and calm and cooperative behavior. *Id.* Both a UDS and an alcohol screen were negative. Tr. at 501. Plaintiff's Lithium level was below the reference range. *Id.* Dr. Shahbahrami admitted Plaintiff with diagnoses of psychosis, mania, and polysubstance abuse. Tr. at 502. Michael Todd Crump, M.D. ("Dr. Crump"), subsequently discharged Plaintiff later that day, as he was no longer psychotic or aggressive and was not suicidal or homicidal. Tr. at 503.

A LRADAC transition/discharge plan dated October 16, 2018, reflects Plaintiff had made adequate progress on his treatment goals and objectives, attended groups consistently, communicated recurrences, been willing to process within groups, and been a positive influence on peers. Tr. at 414. Clinician Jonathan Wright recommended that Plaintiff engage in the level I men's outpatient program that was inclusive of life skills and recovery management. *Id.* Plaintiff's diagnoses included severe alcohol use disorder in early remission, severe amphetamine use disorder in early remission, and mild cocaine use disorder in sustained remission. Tr. at 415.

On April 22, 2019, Plaintiff presented to Kimberly K. Kruse, Psy. D. ("Dr. Kruse"), for a consultative MSE. Tr. at 521. He reported depression and atypical behavior patterns involving extreme hyperactivity and disordered thinking, both within and outside the context of drug use. *Id.* He endorsed increased emotional distress after having injured his foot in a go-cart accident in late 2014 and been unable to work. Tr. at 522. He noted this led to difficulty supporting his family financially, loss of independence, and emotional challenges related to his physical injury. *Id.* He indicated he felt the government was watching and listening to him. *Id.* Plaintiff's father reported that Plaintiff had searched the property for wire taps and other surveillance equipment. *Id.* Plaintiff endorsed some visual hallucinations that challenged him to chase them through the woods. *Id.* He indicated he

had abstained from drugs for a year-and-a-half, aside from one slip-up with

methamphetamine. Tr. at 524.

Dr. Kruse observed Plaintiff to be alert and oriented; to present with

appropriate grooming and hygiene; to be casually dressed; to have euthymic

mood with congruent affect; to be easily irritated at times; to ambulate

without assistance; to demonstrate unremarkable psychomotor activity; to

have normal rate, tone, and rhythm of speech; to have logical, linear, and

goal-directed thought processes; to maintain appropriate eye contact; to show

no evidence of overt psychosis or delusional process; and to be of average

intelligence. Tr. at 524–25. She stated Plaintiff was able to provide a

seemingly-accurate historical timeline without assistance and did not appear

to be responding to internal stimuli or to be distractible. Tr. at 525. She

indicated Plaintiff had intact attention, repeating five digits forward. *Id.* She

noted Plaintiff was able to recall three of three objects immediately and after

a delay and interference task. *Id.* She observed Plaintiff to execute a three-

step verbal command and to perform simple mathematical calculations. *Id.*

Dr. Kruse provided the following diagnostic impression:

> He carries a diagnosis of bipolar disorder and this is therefore
> conceded; however, his description of symptoms are not
> particularly fitting of this diagnosis. Rather, a process of
> methamphetamine-induced psychosis seems more likely. The
> predominant symptoms and the claimant's presentation are
> paranoia, persecutory delusions and hallucinations.
> Methamphetamine associated psychosis is characterized by
> recurrence during periods of abstinence from the drug. He is not

> reporting symptoms consistent with PTSD during the interview today. Criminal history appears to occur within the context of substance intoxication and/or underlying psychiatric instability.

*Id.* She diagnosed severe methamphetamine use disorder, methamphetamine-induced psychosis, and unspecified bipolar disorder, by history. *Id.* She indicated Plaintiff maintained independence in his activities of daily living, "retain[ed] the capacity for appropriate interpersonal interaction when not under the influence of drugs," was able to understand and follow directions, and was capable of performing normal cognitive tasks during periods of sobriety. Tr. at 526. However, she recommended ongoing fiduciary support for finances given Plaintiff's history of polysubstance abuse and problems within the context of drug use. *Id.*

Dr. Kruse also completed a mental ability to do work-related activities form. Tr. at 518–20. She indicated that with ongoing sobriety, Plaintiff's impairments did not affect his abilities to: understand, remember, or carry out instructions; interact appropriately with supervisors, coworkers, and the public; respond to changes in the routine work setting; concentrate, persist, or maintain pace; or adapt or manage himself. Tr. at 518–19. She wrote: "I would expect increased abilities in all domains of functioning, to include mood, cognition, financial planning, occupation, relationships, with sustained sobriety. Polysubstance abuse likely plays a primary role in his history of legal and behavioral problems." Tr. at 519. She considered ongoing financial

oversight to be warranted until Plaintiff could maintain a sustained period of sobriety. Tr. at 520.

A court order dated July 11, 2019, committed Plaintiff to a state mental health facility for inpatient care and to subsequently be committed to a local mental health facility for outpatient treatment for a period not to exceed 12 months. Tr. at 32.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on November 8, 2018, Plaintiff testified he was 6' tall, weighed 190 pounds, and was right-handed. Tr. at 40. He said he was single and had two children, ages 12 and 14. *Id.* He stated his children had lived with him for 10 years until the prior year, when a court awarded his parents custody after he experienced a period of psychosis. Tr. at 41. He indicated he received long-term disability benefits that were scheduled to cease within two months. *Id.*

Plaintiff testified he had a driver's license and drove nearly every day. Tr. at 42. He denied having driven to the hearing, noting he rode with his parents. *Id.* He stated he had difficulty paying bills because he would change his passwords repeatedly during manic phases, as he felt his computer was

"watching [him]." *Id.* He said his parents were taking care of his bills. Tr. at 43.

Plaintiff testified he had worked as a field superintendent/field manager in installation sales for a building supply company and had been self-employed in construction work prior to July 25, 2016. Tr. at 43–44. He stated he had worked for the building supply company for 13 or 14 years. Tr. at 44. He indicated he supervised subcontractors on that job. *Id.*

Plaintiff testified he had problems with his back over the prior 20 years due to injuries in car and motorcycle wrecks. Tr. at 45. He said he had lower back pain that increased with sitting or standing for many hours. *Id.* He rated his pain as a four-and-a-half on a typical day and a seven on a bad day. *Id.* He denied taking any medication other than Aleve for pain. *Id.*

Plaintiff stated he experienced left shoulder pain and had surgery around 2005. Tr. at 46. He denied a recent MRI. *Id.* He described difficulty with ROM and raising his arm above his head. Tr. at 47. He said it was bearable on some days and painful on others. *Id.* He rated his left shoulder as typically a three, but a five or six on a bad day. *Id.*

Plaintiff testified he had hardware in his left foot, after shattering it in 2013 or 2014. *Id.* He said his left foot pain was worse than his back pain. *Id.* He stated he could not stand and walk for longer than four-and-a-half or five

hours and would limp for five days thereafter. *Id.* He indicated he was supposed to use a cane, but was "getting along without it." *Id.*

Plaintiff confirmed that he had been diagnosed with depression, anxiety, bipolar I disorder, and PTSD. Tr. at 48. He stated he was taking medications, but had some difficulty finding the right ones. *Id.* He indicated his medications had been changed two weeks prior and seemed to be working. *Id.* He said his medication had been adjusted roughly 15 times over the prior two years. *Id.* He noted he had previously taken Lithium and Risperdal. *Id.*

Plaintiff testified he continued to see a counselor at LRADAC twice a week, down from three times a week. Tr. at 49. He said he was supposed to see Dr. Beckman at LCMH every other week, but had been unable to see her as frequently because of scheduling problems. *Id.* He stated he had been psychiatrically hospitalized a few times, including three to four weeks prior, when he ran nude around his neighborhood and destroyed property during a manic attack. Tr. at 49, 50. He said the police had responded and used a taser to subdue him, prior to transporting him to LMC. Tr. at 50. He stated he had previously been hospitalized at Three Rivers Behavioral Center and Morris Village. Tr. at 49. He noted he had been hospitalized at LMC about five times over the prior two years. *Id.*

Plaintiff testified he enjoyed cooking. Tr. at 50. He stated he washed dishes and cleaned laundry. Tr. at 50–51. He denied vacuuming, mopping,

and sweeping, as he was unable to stand to perform the tasks. Tr. at 51. He said he tried to avoid shopping for groceries, but did so as necessary. *Id.* He stated he was unable to maintain attention for long periods because of prior methamphetamine use. *Id.* He said he had refrained from substance abuse over the prior ten-and-a-half months, except for having used Adderall two-and-a-half to three months prior. *Id.* He indicated he had last used methamphetamine in early January. *Id.* He described sleeping on his couch during the night, waking between 9:00 and 10:00 AM, watching television, performing some tasks in his garage, eating, going to LRADAC on some days, visiting his children at his parents' house on other days, and going to bed. Tr. at 52.

Plaintiff testified that his providers had mentioned a diagnosis of acute psychosis during his last hospitalization. *Id.* He said his medication caused stomach pain. Tr. at 54. He indicated he used the restroom frequently due to an overactive bladder. *Id.* He stated he experienced manic episodes every month-and-a-half to two months. *Id.* He described manic highs in which he became violent. *Id.* He said he experienced manic lows for a week-and-a-half each month in which he slept and did not feel like eating, speaking with anyone, or going anywhere. *Id.*

Plaintiff admitted he could likely work, but would not be reliable to perform tasks like answering a phone or using a computer. Tr. at 55. He

explained that during his last manic high episode, he felt like he was dead, the things he was hitting were not real, and he had to destroy things to make his pain go away. Tr. at 55–56. He said he left his job because he became overwhelmed with emails and considered them to be secret codes and death threats to his children. Tr. at 56. He stated he could no longer work with electronics. *Id.*

            b.    Witness Testimony

Plaintiff's father ("Father") testified at the hearing. Tr. at 56–59. He stated he saw Plaintiff nearly every day. Tr. at 57. He indicated he lived approximately 10 minutes away from Plaintiff and had custody of his two children. *Id.* He said Plaintiff's mental condition prevented him from being able to provide care to his children. *Id.*

Father testified that even during periods of sobriety, Plaintiff had difficulty remaining focused and could not concentrate. *Id.* He stated that some of Plaintiff's symptoms were triggered by using a phone or a computer and that he often claimed he had been hacked. Tr. at 57–58. However, he noted Plaintiff still had difficulty concentrating when he was not around a phone or computer. Tr. at 58.

Father testified that, to his knowledge, Plaintiff had last used illicit drugs several months prior. *Id.* He stated Plaintiff's last period of decompensation was about three weeks prior to the hearing. *Id.* He indicated

he had received a call from Plaintiff's neighbor around 1:30 a.m., notifying him that Plaintiff had been outside unclothed and had destroyed his mailbox. *Id.* He stated he drove to Plaintiff's house, where he discovered Plaintiff had damaged the back window and hood of his vehicle. *Id.* He said he heard Plaintiff yelling and screaming inside the house and knew no one else was inside. *Id.* He indicated he called law enforcement, who went in the house, tased Plaintiff, and transported him to LMC. *Id.* He testified that Plaintiff's drug screen was negative. Tr. at 58–59. He stated Plaintiff was released from the hospital, but was acting strangely the following day. Tr. at 59. He indicated he contacted law enforcement again and they responded, but did not take him into custody, as he was not threatening anyone. *Id.*

Father testified Plaintiff "kn[ew] what to say" to law enforcement and medical providers to get them to conclude he did not present a threat. *Id.* He explained that in January 2018, Plaintiff was released from LMC after two days and subsequently broke into his house, attacked him, and broke his nose. *Id.*

### c.    Vocational Expert Testimony

Vocational Expert ("VE") Mary Cornelius reviewed the record and testified at the hearing. Tr. at 60–62. The VE categorized Plaintiff's PRW as a sales superintendent, *Dictionary of Occupational Titles* ("*DOT*") No. 250.157-101, as requiring light exertion and having a specific vocational preparation

("SVP") of 7, and a contractor, *DOT* No. 182.167-010, as requiring light exertion and having an SVP of 7. Tr. at 60–61. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work with the following restrictions: requiring no more than simple, routine, repetitive tasks; not performed in a fast-paced production environment; involving only simple work-related instructions and decisions and relatively few workplace changes; requiring no more than occasional interaction with coworkers and members of the general public; and requiring the ability to maintain concentration, persistence, and pace for two-hour increments. Tr. at 61. The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the economy the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of 2 as a garment sorter, *DOT* No. 222.687-014, a basket filler, *DOT* No. 529.687-018, and a binder/sorter, *DOT* No. 521.687-018, with 196,000, 75,000, and 120,000 positions in the national economy, respectively. Tr. at 61–62.

For a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in the first question, except that he could not maintain concentration, persistence, or pace for two-hour increments; would be off task for 20% of the workday; and would miss three days of work per month. Tr. at 62. He asked if

the individual would be able to perform any work. *Id.* The VE testified the restrictions would preclude all competitive employment. *Id.*

The ALJ asked the VE if her testimony was consistent with the information in the *DOT*. *Id.* The VE stated it was, except that the *DOT* did not address time off-task or absences. *Id.* She indicated that portion of her testimony was based on her education, training, observation, and relationship with employers. *Id.*

Plaintiff's representative declined to question the VE. *Id.*

### 2.    The ALJ's Findings

In his decision dated July 18, 2019, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.
2.    The claimant has not engaged in substantial gainful activity since July 25, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has the following severe impairments: back pain, anxiety, mood disorder, bipolar disorder with psychosis, history of substance abuse, depression, and posttraumatic stress disorder (20 CFR 404.1520(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and is further limited to the following: occupations requiring no more than simple routine repetitive task[s], not performed in a fast paced production environment, involving only simple work related instructions and decisions and relatively few workplace

changes. Further limited to occupations requiring no more than occasional interaction with co-workers and members of the general public. The claimant will be able to maintain concentration[,] persistence and pace for 2 hour increments.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December 1, 1980 and was 35 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 25, 2016, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 19–25.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)   the Appeals Council erred in declining to remand the case to the ALJ to consider evidence of a brain tumor;

2)   the ALJ did not properly evaluate Plaintiff's bipolar and substance abuse disorders; and

3)   the ALJ failed to consider the combined effect of Plaintiff's physical and mental impairments.

The Commissioner counters that substantial evidence supports the

ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4)

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).
[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d

287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    New Evidence

Plaintiff attached additional evidence to his brief that does not appear elsewhere in the record. The evidence is summarized as follows:

Plaintiff presented to advanced nurse practitioner Leah E. Cuff ("NP Cuff") for evaluation of a brain tumor on January 27, 2020. [ECF No. 28-1 at 6]. He endorsed a three-year history of right facial pain to the V3 segment that was exacerbated by cold, touch, eating, talking, and heat. *Id.* He said Neurontin had not provided relief. *Id.* NP Cuff recorded normal findings on physical exam. *Id.* at 9–10. She noted an MRI of Plaintiff's brain showed a large posterior fossa contrast enhancing lesion to the right of the right cerebellopontine angle ("CPA") cistern. *Id.* at 11. She diagnosed a brain tumor and discussed proceeding with a craniotomy with resection of the tumor. *Id.* Plaintiff agreed to proceed with the surgery. *Id.*

On March 12, 2020, with NP Cuff's assistance, Roham Moftakhar, M.D. ("Dr. Moftakhar"), performed craniotomy with resection of the CPA lesion. *Id.* at 1, 13, 30–31. He noted the tumor was complex and the procedure took longer than anticipated due to its adherence to the brainstem cranial nerves. *Id.* at 31. Plaintiff was admitted to the neurosurgery intensive care unit for frequent neuromonitoring, subsequently transferred to a regular nursing floor, and released on March 14. *Id.* at 14, 58–59, 70.

Plaintiff argues the court should remand the case to the ALJ for consideration of this evidence, as the brain tumor affected his functioning prior to the ALJ's decision even though it was diagnosed significantly thereafter. [ECF No. 28 at 2–3]. He claims that he experienced symptoms

related to the brain tumor, including facial pain and sensitivity, headaches, and mental problems, such as confusion, bipolar disorder, and psychosis in the three years prior to having undergone surgery in March 2020. *Id.* He maintains a rehearing is required for the ALJ to evaluate the disabling effects that might have been caused by the brain tumor. *Id.* at 3.

The Commissioner argues the evidence Plaintiff attached to his brief was never submitted to the Appeals Council. [ECF No. 30 at 1, 7–8]. He maintains that because the evidence was not included in the administrative record, Plaintiff's only avenue for remand is through sentence six of 42 U.S.C. § 405(g). *Id.* at 14–15. He contends the records are not new and material and Plaintiff has not shown good cause for his failure to submit the records earlier, as required for remand pursuant to sentence six. *Id.* at 1, 15–18.

"A district court may remand a final decision of the [Commissioner] only as provided in sentences four and six of 42 U.S.C. § 405(g): in conjunction with a judgment affirming, modifying, or reversing the [Commissioner's] decision (sentence four), or in light of additional evidence without any substantive ruling as to the correctness of the [Commissioner's] decision, but only if the claimant shows good cause for failing to present the evidence earlier (sentence six)." *Melkonyan v. Sullivan*, 501 U.S. 89, 90 (1991). The court's review under sentence four is limited to the pleadings and administrative record. *See* 42 U.S.C. § 405(g); *Wilkins v. Sec'y, Dep't of*

*Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc). When a plaintiff seeks to introduce new evidence in the district court that was not included in the administrative record, such evidence may only be considered pursuant to sentence six. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990) ("The sixth sentence of § 405(g) plainly describes an entirely different kind of remand, appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of the proceeding.").

Although Plaintiff references the Appeals Council's duty to "'evaluate the entire record,' including 'new and material evidence,' in determining whether to grant review" pursuant to 20 C.F.R. § 404.970(b), ECF No. 28 at 3, he does not affirmatively state that he submitted the records attached to his brief to the Appeals Council. The record reflects Plaintiff submitted a request for review of the ALJ's decision that the Appeals Council received on September 18, 2019. Tr. at 5. On September 19, 2019, the Appeals Council notified Plaintiff that he could submit additional evidence and that it would not act for at least 25 days. Tr. at 7.

If a claimant submits additional evidence and the Appeals Council concludes it is not new, material, or related to the period on or before the hearing decision or that the claimant did not have good cause for failing to submit it prior to the hearing, it will send the claimant "a notice that

39

explains why it did not accept the additional evidence" and will advise him of his right to file a new application." 20 C.F.R. § 404.970(c).

The Appeals Council denied Plaintiff's request for review on June 4, 2020. Tr. at 1. The Notice of Appeals Council Action reflects that Plaintiff submitted additional evidence that included "a Court Order for commitment from South Carolina, dated July 11, 2019 (3 pages)." Tr. at 2. The Appeals Council declined to exhibit this evidence, as it found that it did not show a reasonable probability that it would change the outcome of the decision. *See id.* The evidence Plaintiff attached to his brief does not appear in the record, and the record does not reflect that he submitted it to the Appeals Council or that the Appeals Council returned it to him.

Given that Plaintiff has not affirmatively stated he submitted the evidence to the Appeals Council, the absence of the evidence from the administrative record, and no communication from the Appeals Council addressing the evidence, the court is inclined to conclude the evidence was not submitted at the administrative level and the only potential route for remand is through sentence six of 42 U.S.C. § 405(g).[5]

---

[5] The undersigned notes the same general criteria direct remand under sentence four where substantial evidence does not support the Appeals Council's consideration of new and material evidence. Pursuant to 20 C.F.R. § 404.970(a), the Appeals Council must grant a claimant's request for review if . . . [it] receives additional evidence that is new, material, and relates back to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the

Plaintiff cites *Sims v. Apfel*, 530 U.S. 103 (2000), as supporting his argument. In *Sims*, the court concluded claimants were not required to exhaust issues in their requests for review by the Appeals Council to preserve judicial review of those issues. *Id.* This case is distinguishable from *Sims*, as Plaintiff is asking the court to consider evidence, as opposed to issues, that were not included in the record before the Appeals Council. The conditions through which the court is to consider evidence not included in the administrative record are set forth in sentence six of 42 U.S.C. § 405(g).

For the court to remand a case pursuant to sentence six, three criteria must be met. The court may remand the case "upon a showing that there is [1] new evidence which is [2] material and that there is [3] good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Shalala v. Schaefer*, 509 U.S. 292, 297 n.2 (1993) ("Sentence-six remand may be ordered . . . where new, material evidence is adduced that was for good cause not presented before the agency." (citations omitted)).

---

outcome of the decision." In addition, the claimant must show good cause for not informing the ALJ about or submitting the evidence prior to the hearing." 20 C.F.R. § 404.970(b). If these criteria are satisfied, the court is to remand the case if it is unable to determine whether substantial evidence supported the ALJ's denial, given the addition of new evidence to the prior record. *Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011). Thus, even if Plaintiff were to assert that he submitted the evidence to the Appeals Council, the court's rationale would remain the same.

"Evidence is new 'if it is not duplicative or cumulative.'" *Meyer*, 662 F.3d at 705 (quoting *Wilkins*, 953 F.2d at 96). The undersigned concludes the evidence Plaintiff submitted with his brief is new, as it does not appear elsewhere in the record. Thus, Plaintiff has satisfied the first criterion for remand pursuant to sentence six.

The Fourth Circuit has explained that evidence is material "if there is a reasonable possibility that [it] would have changed the outcome." *Wilkins* at 96. Plaintiff claims "the brain lesion likely caused symptoms including headaches, facial pain and sensitivity, mental issues such as confusion and bipolar disorder, and psychosis that were evident" prior to the hearing before the ALJ. [ECF No. 28 at 2]. In support of his argument, Plaintiff points to a headache questionnaire dated February 7, 2017. *See* ECF No. 28 at 2 (referencing Tr. at 201–04). This questionnaire was signed by Plaintiff's non-attorney representative, who claimed to have completed it based on his responses. *See* Tr. at 204. In the questionnaire, Plaintiff indicated he experienced headaches on February 4, 5, 6, and 7, and had begun experiencing severe daily headaches four to six months prior. Tr. at 201. Despite his claims in the headache questionnaire, Plaintiff has pointed to no medical record reflecting complaints of or treatment for headaches over the relevant period, and the undersigned's review has also failed to yield such evidence. Therefore, the record does not establish headaches as a medically-

determinable impairment. *See* 20 C.F.R. § 404.1521 (providing "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source" and that the Social Security Administration ("SSA") will not use a claimant's "statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment"); 20 C.F.R. § 404.1502(f) (defining objective medical evidence as "signs, laboratory findings, or both"). Plaintiff has also failed to note any evidence in the records he attached that would establish headaches as a medically-determinable impairment or suggest his brain tumor was causing headaches.

The only reference in the 2020 records to Plaintiff's condition prior to the ALJ's decision is the indication of a three-year history of right facial pain to the V3 segment that was exacerbated by cold, touch, eating, talking, and heat. *See* ECF No. 28-1 at 6. However, this is an allegation, as Plaintiff's medical providers do not confirm that such symptoms are consistent with the brain tumor. Plaintiff references no evidence of such complaints in the administrative record, and the undersigned's review yields no such evidence. The only evidence to suggest Plaintiff might have had a brain tumor during the relevant period is Plaintiff's February 2018 claim to SW Kea that he had recently been diagnosed with a brain cyst or tumor. Tr. at 390. However, the record contains no evidence establishing a brain tumor as a medically-determinable impairment prior to the ALJ's decision.

Plaintiff has presented no evidence to support a finding that the brain tumor for which he received treatment in early 2020 caused headaches, facial pain and sensitivity, or mental issues, such as confusion, bipolar disorder, and psychosis during the relevant period. As noted above, Plaintiff's treatment records prior to the July 2019 hearing decision contain no complaints or evidence of headaches or facial pain and sensitivity. While the records reflect mental issues such as confusion, bipolar disorder, and psychosis, Plaintiff has not provided any evidence of a link between his mental functioning and the presence of a brain tumor. In addition, the ALJ considered Plaintiff's mental functioning and confirmed diagnoses as to the sources thereof in assessing the severity of his impairments and his RFC. The undersigned concludes the evidence Plaintiff submitted to the court is not material, as there was no reasonable possibility the ALJ would have changed his decision based on it. Therefore, the second criterion for remand pursuant to sentence six is not met.

Plaintiff also fails to meet the third criterion for a sentence six remand, as the record does not support good cause for his failure to submit the evidence to the Appeals Council for consideration. *See* ECF No. 28 at 1–3. The records reflect Plaintiff visited NP Cuff for evaluation of the brain tumor on January 27, 2020, and underwent surgery on March 12, 2020. *See* generally ECF No. 28-1. Thus, Plaintiff was aware of his brain tumor

diagnosis in January 2020, more than four months prior to the Appeals Council's decision. Although the undersigned acknowledges that medical records might not be immediately available following a treatment visit or procedure and the COVID-19 pandemic might have delayed receipt of records, Plaintiff should have been able to obtain the records and submit them to the Appeals Council if he had diligently pursued them. In the absence of any reason for Plaintiff's failure to submit the evidence to the Appeals Council and given the period that elapsed between the time the records were created and the Appeals Council's decision, the undersigned finds Plaintiff has not demonstrated good cause for failing to incorporate the evidence into the administrative record.

The court denies Plaintiff's request for remand based on new evidence, as the evidence he submitted to the court does not meet the materiality and good cause elements required for remand pursuant to sentence six of 42 U.S.C. § 405(g).

### 2.     Bipolar and Substance Abuse Disorders

Plaintiff argues the ALJ failed to adequately consider his bipolar and substance abuse disorders. [ECF No. 28 at 3]. He maintains the ALJ erred in accepting the consultative examiner's opinion that his mental symptoms were related to drug abuse, given evidence that he had a brain tumor. *Id.* at 3–4.

He further contends the ALJ should have treated his substance abuse as a disease and considered its possible debilitating effects. *Id.* at 4.

The Commissioner argues the ALJ considered Plaintiff's history of substance abuse as a severe impairment throughout the decision and notes the applicable law prohibits a finding of disability based on substance abuse. [ECF No. 30 at 1, 18–19].

"Except as provided in subparagraph (C), an individual shall be disabled for purposes of this subchapter if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least a continuous period of not less than twelve months." 42 U.S.C.A. § 1382c(a)(3)(A). "Notwithstanding subparagraph (A), an individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this paragraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C.A. § 1382c(a)(3)(J).

The Social Security Administration ("SSA") promulgated SSR 13-2p to explain agency policy for evaluating claims involving substance use disorder. The drug and alcohol evaluation process is a series of six steps, evaluating: (1) whether the claimant has drug addiction or alcoholism; (2) whether the claimant is disabled considering all impairments, including the drug

addiction or alcoholism; (3) whether drug addiction or alcoholism is the only impairment; (4) whether the claimant's other impairment or combination of impairments are disabling by themselves while the claimant is dependent upon or abusing drugs or alcohol; (5) whether the drug abuse or alcoholism causes or affects the claimant's other medically-determinable impairments; and (6) whether the claimant's other impairments would improve to the point of nondisability in the absence of drug and alcohol abuse. SSR 13-2p, 2013 WL 621536, at *5 (2013). If a decision regarding disability may be made at any step, it is unnecessary for the ALJ to proceed to the next step. *Id.* When an ALJ adjudicates a disability claim where drug or alcohol abuse is among the claimant's medically-determinable impairments and determines the claimant is disabled considering all his medically-determinable impairments, he must determine whether the claimant would continue to be disabled if he stopped using drugs or alcohol. *Id.* at *2. In other words, he must determine whether drug or alcohol abuse is "material" to the finding that the claimant is disabled. *Id.* (citing 20 C.F.R. §§ 404.1535, 416.935). However, if he finds the claimant is not disabled considering all impairments to include alcohol or drug abuse, it is not necessary for the ALJ to consider the materiality of the alcohol or drug abuse. *Id.* at *4, 6.

In all cases involving mental impairments, ALJs are required to use the special technique in 20 C.F.R. § 404.1520a to evaluate severity. After

determining a claimant has a severe mental impairment, the ALJ must rate the degree of the claimant's functional limitation as none, mild, moderate, marked, or extreme based on "the extent to which [his] impairment(s) interfere with [his] ability to function independently, appropriately, effectively, and on a sustained basis" in the broad functional areas of understanding, remembering or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. 20 C.F.R. § 404.1520a(b), (c)(2), (3), (4). If the ALJ rates the degree of the claimant's limitations as "none" or "mild," he will generally conclude the impairment is non-severe, unless the evidence otherwise indicates there is more than a minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). If the ALJ rates the degree of Plaintiff's limitations as moderate, marked, or extreme, he should conclude the impairment is severe and assess whether it meets or equals a listing. 20 C.F.R. § 404.1520a(d)(2). If the claimant's impairment is severe, but does not meet or equal a listing, the ALJ should consider it in assessing the RFC. 20 C.F.R. § 404.1520a(d)(3).

Turning to Plaintiff's specific arguments, as discussed above, nothing in the evidence he submitted to this court shows he experienced psychiatric symptoms related to a brain tumor prior to the ALJ's decision.

Plaintiff's claim that the ALJ did not treat his "substance abuse as a disease," ECF No. 28 at 4, is also without merit. The ALJ assessed mental impairments to including anxiety, mood disorder, bipolar disorder with psychosis, depression, and PTSD as severe at step two. Tr. at 20. He also considered Plaintiff's history of substance abuse to be a severe impairment, noting:

> The undersigned fully recognizes that the claimant has a history of substance abuse (Exhibit 2F). However, it is noted in the record that the claimant is receiving treatment for his condition, to include counseling and voluntary and involuntary admission into a treatment program (Exhibits 3F and 12F). Thus, the undersigned finds the evidence is sufficiently convincing to establish that the claimant would remain limited to the confines of the residual functional capacity regardless of the impact of substance use and it is therefore not material.

*Id.* The ALJ engaged the process in SSR 13-2p and found consideration of all Plaintiff's impairments, including his history of substance abuse, would still allow him to perform jobs consistent with the assessed RFC.

In accordance with 20 C.F.R. § 404.1520a, the ALJ considered Plaintiff's mental functioning in the four broad areas. He assessed Plaintiff as having "a mild limitation in understanding, remembering, or applying information, a moderate limitation in interacting with others, a moderate limitation in concentrating, persisting or maintain pace, and a mild limitation in adapting or managing oneself." Tr. at 21. He explained:

> At the hearing, the claimant testified to being diagnosed with anxiety, depression, bipolar disorder, and posttraumatic stress

disorder. He further alleged an inability to sustain concentration for a long period and stated that his medication is ineffective. However, despite his condition, the claimant has the ability to read and write, cook, wash dishes, do laundry, drive almost every day, and go grocery shopping once in a while. He also testified to completing the 12th grade. Accordingly, these activities demonstrate his ability to understand, remember, and apply information, maintain at least some appropriate social interaction, maintain concentration, persistence and pace on tasks, and manage himself.

Tr. at 21. The ALJ found Plaintiff's mental impairments did not meet the requirements for a finding of disability pursuant to Listings 12.04, 12.06, and 12.15. Tr. at 20–21.

The ALJ included, in the RFC assessment, provisions for "occupations requiring no more than simple routine repetitive task[s], not performed in a fast paced production environment, involving only simple work related instructions and decisions and relatively few work place changes," "requiring no more than occasional interaction with co-workers and members of the general public," and the ability "to maintain concentration persistence and pace for 2 hour increments." Tr. at 21–22. In discussing the RFC assessment, the ALJ wrote:

According to the medical records, the claimant's medical history consists of panic attacks, anxiety, bipolar disorder, and substance induced psychosis (Exhibits 2F, 3F, 7F and 18F). Additionally, the claimant has a history of experiencing hallucinations and in December 2016, he was involuntarily admitted to Three Rivers for psychosis and substance abuse (Exhibit 3F6). However, upon discharge, his psychiatric status improved on medication and he was noted as doing well on current medication regimen in July 2017 (Exhibits 3F2 and 7F1). Moreover, since his discharge, the

claimant was showing improvement and continuing his sobriety
until his relapse in 2018 (Exhibits 7F, 11F, and 17F). Despite the
claimant's voluntary admissions into a treatment facility for
delusion and substance abuse, his hospitalizations did no[t] last
more than a couple of days (Exhibits 11F and 17F). Furthermore,
the claimant's mental status examinations were relatively
normal except for some depressed mood (Exhibits 7F, 8F, 17F,
and 18F), and it is noted in the record that the claimant develops
psychosis "whenever he uses methamphetamine" (Exhibit 17F9).
The undersigned further notes that a licensed clinical
psychologist opined that she expects "increased abilities in all
domains of functioning, to include mood, cognition, financial
planning, occupation, and relationship, with sustained sobriety"
(Exhibit 18F2).

Tr. at 22–23.

To the extent Plaintiff argues the ALJ did not consider his substance
abuse was disabling, the undersigned rejects this argument. The ALJ found
Plaintiff was not disabled when all his impairments, including a history of
substance abuse, were considered. However, even if the ALJ had erred in this
aspect of his assessment, the error would have been harmless, as Plaintiff
cannot be awarded benefits where substance abuse is a contributing material
factor to his disability. *See* 42 U.S.C.A. § 1382c(a)(3)(J) (providing "an
individual shall not be considered to be disabled . . . if alcoholism or drug
addiction would . . . be a contributing factor material to the Commissioner's
determination that the individual is disabled); *see also Mickles v. Shalala*, 29
F.3d 918, 921 (4th Cir. 1994) (finding harmless error where "the ALJ
conducted the proper analysis in a comprehensive fashion, "cited substantial

evidence to support his finding," and "there is no question but that he would have reached the same result notwithstanding his initial error").

Considering the foregoing, substantial evidence supports the ALJ's assessment of Plaintiff's history of substance abuse and other mental impairments.

### 3.    Combination of Physical and Mental Impairments

Plaintiff argues the ALJ failed to consider that a combination of physical and mental impairments prevented him from working. [ECF No. 28 at 4]. He maintains he is disabled based on headaches, ankle pain, manic depression, PTSD, psychosis, and anxiety. *Id.* He contends the ALJ failed to consider that his pain could exacerbate his mental symptoms. *Id.*

The Commissioner claims the ALJ considered the entire record and the combined effect of all Plaintiff's symptoms in the decision. [ECF No. 30 at 1–2, 19]. He maintains the ALJ was not required to address the effects of physical pain on Plaintiff's mental functioning, as the record contains few mentions of physical pain and specific indications that pain did not affect his mental functioning. *Id.* at 19.

If a claimant has multiple impairments, the ALJ is required to "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately would be of sufficient severity." 20 C.F.R. § 404.1523(c). It must be "clear from the

decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-cv-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012) (citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995). However, absent evidence to the contrary, the court should accept the ALJ's assertion that he considered the combined effect of the claimant's impairments. *See Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter.").

As an initial matter, the undersigned reiterates that the ALJ was not required to consider headaches in assessing Plaintiff's RFC because the evidence did not establish headaches as a medically-determinable impairment. As for the other impairments, it appears the ALJ assessed all but left ankle pain as severe and provided a reason for concluding it was not severe. *See* Tr. at 20, 23. The ALJ's RFC assessment reflects his consideration of the functional limitations imposed by Plaintiff's severe and non-severe impairments. *See generally* Tr. at 21–23. Plaintiff's claim that the ALJ failed to consider that his physical pain exacerbated his mental problems is refuted by the ALJ's indication that "the record shows that his physical symptoms have not manifested even to the point that he has complained of

them to treating sources or that would otherwise indicate an inability to perform within a range of light work." Tr. at 23. Thus, the ALJ concluded the record lacked evidence to support a finding that Plaintiff's physical impairments caused any greater mental restrictions. Given the foregoing, substantial evidence indicates the ALJ considered the combined effect of Plaintiff's mental and physical impairments in assessing his RFC.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

May 20, 2021
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge